IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM HARRISON and STEVEN )
STRATOS, )
)
) Case No. 04 C 6232
Plaintiffs. )
v. ) Judge Virginia M. Kendall
)
RBC MORTGAGE COMPANY and PACIFIC )
GUARANTEE MORTGAGE CORP. d/b/a RBC )
MORTGAGE COMPANY OF CALIFORNIA, )

Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiffs William Harrison and Steven Stratos (collectively "Plaintiffs") filed suit against Defendant RBC Mortgage Company ("RBCM") and Pacific Guarantee Mortgage Corp. (collectively "Defendants") for breach of contract claiming that Defendants refused to pay them money they believe they are due from a settlement and mutual release agreement (the "Settlement Agreement") the parties entered into on December 20, 2002 to resolve a previous lawsuit. As part of that Settlement Agreement, Plaintiffs were to receive a certain percentage of commissions from the mortgage business and were potentially entitled to a further amount of commissions (the "Holdback Amount") if they brought a binding letter of intent from a third party investor to RBCM for the potential sale of the line of business. Plaintiffs allege that Defendants failed to compensate them for presenting a Letter of Intent from Resource Bank that complied with the terms of the Settlement Agreement and as a result they are due over $400,000. Defendants counter that the letter presented to RBCM failed to meet the requirements of the Settlement Agreement because it was neither binding nor was it jointly presented as the Settlement Agreement required. As such, they have

refused to provide defendants the amount of money that was set aside for the completion of this condition of the settlement agreement. After a bench trial, the Court finds that the parties intended that the letter of intent be binding and that it be presented by both Plaintiffs. The Court further finds that the parties understood these terms at the time they entered into the Settlement Agreement and acted in accordance with that understanding. Because Plaintiffs failed to comply with those two conditions of the agreement, the Plaintiffs breached the Settlement Agreement and Defendants need not pay them the Holdback Amount.

## FACTS

Plaintiffs Stratos and Harrison worked in the mortgage loan origination business of RBCM, starting in 2001 where they ran what is called the Government Services Division (the "Division"). *Tr. 51-54.* The Division operated net branch loan origination offices (as distinct from retail loan origination conducted directly from employees of various bank branches) which solicited loans for RBCM. *Tr. 52-54.* The Division had formerly been part of Pacific Guarantee Mortgage. *Tr. at 51-54.*

In mid-2002, Harrison and Stratos and RBCM disputed the accounting for loans procured by the Division and a lawsuit ensued with both parties alleging fraud against the other. *Tr. 160-161.* On December 20, 2002, to resolve the pending lawsuit, the parties entered into the Settlement Agreement. *Tr. 56.* Pursuant to the Settlement Agreement, RBCM agreed to pay Harrison and Stratos a commission on all loans originated by the Division from November 1, 2002 through the termination of the Settlement Agreement, which was to occur when the Division was sold. *Tr. 57-58.* The settlement agreement provided that the division was to be sold no later than May 31, 2003. *Tr. 68.* Plaintiffs were further entitled to the Holdback Amount, a portion of the commission for

2

each month from January through March of 2003, if they presented a binding letter of intent to RBCM by March 31, 2003. The Settlement Agreement stated:

> On or before March 31, 2003, Claimants shall present a binding letter of intent from a bona fide third party investor (with required mortgage licenses or exemptions and a suitable warehouse line) ("Third Party Investor") that states that the investor intends to accept the Division with a closing and complete transition from the Company to the third party on or before May 31, 2003 ("Letter of Intent"). The failure to meet the March 31, 2003 date in accordance with this section for any reason shall enable Company to take any and all actions it deems necessary with respect to the Division, including reorganization, transfer or the termination of the Division, and its personnel and branches. Company shall be permitted to use the Holdback Amount to reimburse itself for incurring any sums in connection therewith, and no excess Holdback Amount shall be returned to Claimants.

*Ex. 1*.[1] The Settlement Agreement further defined "Claimants" as: "Harrison and Stratos" collectively "unless the context otherwise requires." *Id.*

The Settlement Agreement provided for certain compensation to be paid to Plaintiffs Harrison and Stratos. Paragraph 1(b) of the Agreement provided that Harrison and Stratos would be paid "ten (10) basis points times the principal balance of loans originated by Division personnel that are closed and funded by the Company's internal mortgage bank ... beginning November 1, 2002 and concluding on the earlier of (i) the Transition Date ... and (ii) either (x) March 31, 2003 (if the requisite Letter of Intent described in Section 4(a)(1) is not obtained by Claimants) or (y) May 31, 2003 (if the requisite Letter of Intent is obtained)." *Ex. 1*. Of the funds to be paid pursuant to paragraph 1(b), certain funds would be held back (the Holdback Amount) until all of the transition period obligations of Harrison and Stratos were complete. *Id*. The Settlement Agreement further provided that Plaintiffs would receive 12.5 of the basis points for the loan volume revenue from the Division in a given month and that amount would be tendered within 15 days of the end of each

---

[1]The parties submitted an agreed set of Exhibits for trial.

month. *Id.* On a monthly basis beginning in January 2003, RBCM was also required to provide a summary of the Holdback Amount to Plaintiffs. *Id.*; *Tr. 56-62*; *94-95*; *117-118*; *149*. The Holdback Amount was Plaintiffs' sole source of monetary recovery for any claims relating to the Agreement. *Ex. 1, Sec. 4.*

As part of the Settlement Agreement this remaining 7.5 basis points (the Holdback Amount) would be held by the Company's attorney in escrow until the end of the term of the Settlement Agreement. *Tr. 58-59; 116.* However, if the Plaintiffs failed to meet the conditions of §4(a) of the Settlement Agreement, they would forfeit the Holdback Amount. Additionally, it was stipulated that if the Company breached the Settlement Agreement, then the Claimants could "seek specific performance as their remedy" in lieu of the Holdback Amount. *Ex. 1: § 1 (b)(s).*[2]

In the days leading up to the March 31, 2003 deadline, Plaintiffs were separately bringing potential purchasers to the table; Stratos worked with Resource Bank as a potential buyer and Harrison worked with Pinnacle Financial Group. *Tr. 82-83, 164-65*. As the deadline loomed, Harrison and Stratos could not agree on which potential purchaser should be presented to RBCM. Harrison wrote an email to RBCM on March 27, 2003 and informed them that "it does not look like a LOI [letter of intent] will be forthcoming by 3/31 unless something changes. I believe Pinnacle now will bow out of this arena at least for now." *Def. Ex. 23*. As the business day on March 31 drew to a close, Harrison and Stratos could not agree and Harrison admitted in an email at 4:49 p.m. on that day that "Stratos and I couldn't make a deal prior to the 3/31 expiration." *Def. Ex. 22*.

---

[2]While the Plaintiffs contend that the Company breached the *Settlement Agreement*, RBCM sold the Division to Pinnacle Mortgage Corporation and, therefore, specific performance was no longer an option, leaving the monetary damage of the Holdback Amount as their sole remedy.

After the close of the business day but still on the closing deadline of March 31, 2003, Plaintiff Stratos decided to present a letter of intent from Resource Bank in an effort to comply with the Settlement Agreement's deadline. Plaintiff Stratos attached a cover letter to the Letter of Intent from Resource Bank. The cover letter stated as follows:

> We represent Steven C. Stratos. As you know, Steve Stratos and William Harrison entered into a Settlement Agreement and Mutual Release dated December 20, 2002 with RBC Mortgage Company and Pacific Guarantee Mortgage Corporation (the "Settlement Agreement"). Pursuant to the terms of the Settlement Agreement, Messrs. Stratos and Harrison were given until March 31, 2003 to jointly present to the "Company", as that term is defined in the Settlement Agreement, a satisfactory letter of intent showing the intent of a third party investor to accept the "Division", as that term is defined in the Settlement Agreement, with a closing and complete transition of the Division from the Company to the third party investor on or before May 31, 2003. A letter of intent from Resource Bank to Steven C. Stratos is enclosed which indicates the intent of Resource Bank to meet the Company's required timeline and undertaking. Resource Bank has the necessary licenses and has the suitable warehousing lines required by Section 4(a) or the Settlement Agreement.
>
> As you know, the Settlement Agreement contemplates a joint letter of intent between (a) both Mr. Stratos and Mr. Harrison and (b) the third party investor. At this point, Messrs. Stratos and Harrison have yet to agree to terms pursuant to which they can proceed together, so this letter of intent is being presented solely on behalf of Mr. Stratos. Mr. Stratos is leaving open the opportunity for Mr. Harrison to join him in this matter until midnight tonight pursuant to the terms most recently discussed with Mr. Harrison through his attorney, Robert P. Trout, Esquire, of Trout & Richards, P.L.L.C., and is copying both Mr. Harrison and his attorney on this letter by email so that they can contact him at any time up to midnight tonight to express acceptance of those terms. With or without Mr. Harrison, Mr. Stratos is ready to proceed to negotiate a deal between and among himself, the Company and Resource Bank which would involve a closing and transfer of the Division from the Company to Resource Bank on or before May 31, 2003. If Mr. Harrison does not agree to participate, we would ask that you treat the enclosed letter of intent as nonetheless satisfying Section 4 of the Settlement Agreement and proceed with Mr. Stratos and Resource bank in the manner and according to the terms set forth in that document.
>
> It would be in the interests of both Mr. Stratos and the Company to have the transaction described in the letter of intent go forward. If the Company is willing to accept the letter of intent as satisfying the requirements of the Settlement Agreement, Mr. Stratos is willing to proceed to attempt to accomplish this transaction.

*Def. Ex. 17.* The letter was signed by an attorney representing Plaintiff Stratos and a copy of the letter was e-mailed to Plaintiff Harrison that day. The Letter of Intent that was attached to the cover letter, in relevant part, stated as follows:

> If you are able to obtain PGMC's agreement to this transaction, we will conduct due diligence into the operations of the Division and, if the due diligence is satisfactory, we will attempt to negotiate a binding, definitive agreement (the "Definitive Agreement") with PGMC that will contain such terms, conditions, representations, warranties and covenants as are mutually satisfactory and are of a nature consistent with a transaction of this magnitude and the business activities, regulations and restrictions of Buyer, Seller and PGMC.
>
> \* \* \*
>
> This Letter of Intent does not represent or create any legally binding obligation of you or Buyer, and is subject to the negotiation and execution by you and buyer of a mutually agreeable Definitive Agreement. If the parties are unable to negotiate and execute a mutually agreeable Definitive Agreement, the parties shall be under no obligation to each other.

*Id.* Immediately after receiving this letter from Plaintiff Stratos with the accompanying Letter of Intent from Resource Bank, the attorney for RBCM responded on April 1, 2003 as follows:

> RBC Mortgage received your March 31 e-mail letter last night after the close of business. As you acknowledge in your letter, paragraph 4(a) of the Settlement Agreement dated December 20, 2002 between Messrs. Stratos and Harrison and RBC Mortgage (the "Agreement") required that Messrs. Stratos and Harrison, on or before March 31, 2003, "jointly present" a letter of intent from a third party investor evidencing that investor's intent to purchase the "Division," as that term is defined in the Agreement. For reasons unknown to RBC Mortgage, Messrs. Stratos and Harrison failed to jointly present such a letter. Accordingly, the Transition Period defined and described in the Agreement is now complete, and the Holdback Amount (as defined in the Agreement) is forfeited to RBC Mortgage pursuant to paragraph 4 of the Agreement. RBC Mortgage is now free to explore any and all options of its own choosing with respect to its Vienna operations.

*Def. Ex. 19.* On the same day, April 1, 2003, the attorney for RBCM sent a second letter to an attorney regarding the previous evening's missive and both Plaintiffs were copied on this second letter. The second letter stated:

> Bill Harrison and Steve Stratos did not jointly present a binding letter of intent on or before March 31, 2003 in accord with paragraph 4(a) of the Settlement Agreement between them and RBC Mortgage dated December 20, 2002 (the "Agreement"). Accordingly, the Transition Period defined and described in the Agreement is now complete, and the Holdback Amount . . . is forfeited to RBC Mortgage . . . .

*Def. Ex. 18.* The second letter also stated that the final payment owed to Plaintiffs pursuant to the Settlement Agreement would be made on or before April 15, 2003. *Id.* Plaintiffs and their agents did not respond to either of the two letters. No phone calls, letters, emails, or directions were made objecting to the rejection of Plaintiff Stratos' cover letter with the attached Resource Bank Letter of Intent or to the letter stating that the Holdback Amount would not be paid. *Tr. 145-47, 262-23*.

Each month subsequent to the signing of the Settlement Agreement, statements were sent to each of the Plaintiffs indicating the amount of commission that was earned and the Holdback Amount that was reserved. *Tr. 58-59*. For example, in January, Plaintiffs received a statement that stated that $42,500 was the "Holdback Amount" for "Section 4(h) of Settlement Agreement." *Ex. 3*. Again in February and March, Plaintiffs received another breakdown of their income with Holdback Amounts delineated pursuant to "Section 4(h) of Settlement Agreement." *Exs. 6 and 9*. Each time Plaintiffs were provided with these breakdowns, they were also required to sign the "settlement statement/holdback analysis" as "accepted and agreed to." *Exs. 3, 6, 8, 9, 10*. Each time, Plaintiffs agreed and accepted the settlement analysis and the holdback analysis. *Id.*

On April 14, 2003, two weeks after Plaintiffs received notice from Defendants that the Letter of Intent was not accepted and the Holdback Amount would not be provided to them, a settlement statement and holdback analysis was sent to Plaintiffs. *Exs. 13 and 14*. A line was included in this statement that read: "Final Holdback Payable" with the corresponding amount listed as zero. *Id.* Both Plaintiffs signed these April settlement reports and holdback analysis reports as "accepted and

7

agreed to." *Exs. 13, 14*. No further payments were made to Plaintiffs and RBCM sold the Division to Pinnacle Financial Group shortly thereafter and by the May 31, 2003 closing date envisioned in the Settlement Agreement. *Tr. 288-89; 298-301*. Plaintiff Harrison commenced employment with Pinnacle subsequent to Pinnacle acquiring the Division. Eighteen months after Plaintiffs first received the rejection letter from RBCM on April 1, 2003, they filed suit against RBCM alleging breach of contract. *Tr. 187*.

Positions of the Parties

Plaintiffs claim that they met their joint obligation by presenting the Letter of Intent from Resource Bank through Mr. Stratos and as such RBCM is obligated to pay them the Holdback Amount. They claim that because Plaintiffs were jointly and severally liable pursuant to the terms of the Settlement Agreement, Plaintiff Stratos fulfilled their joint obligation by presenting the Letter of Intent by the March 31, 2003 deadline in spite of Plaintiff Harrison's lack of agreement with the proposal. Plaintiffs further state that the Letter of Intent fulfills their obligation under the Settlement Agreement because Resource Bank was capable of completing the purchase and even if the purchase was not consummated, RBCM was not obligated to contract with Resource Bank so the Letter of Intent could never be "binding." *Tr. 173-75*.

Defendants claim that the terms of the Settlement Agreement concerning the Letter of Intent were specifically agreed to and were material to the agreement. They claim that is was essential that both Plaintiffs present the letter because they did not want to be in the middle of in-fighting between the two Plaintiffs which could have resulted in further litigation. *Tr. 314*. In short, they wanted to be done with both Plaintiffs and wanted this agreement to complete all dealings with them and the Division.

On October 21, 2005, Judge Coar ruled that a genuine issue of material fact existed as to whether Plaintiff's letter satisfied the requirement that the letter of intent be binding and found the term "binding" to be ambiguous. Both parties agree that RBCM was not obligated to accept the Letter of Intent presented on March 31, 2003. Defendants, however, claim that having a "binding" letter of intent was a material and significant factor in their drafting of the agreement and it was understood by all parties that it Plaintiffs must provide a "binding" Letter of Intent. Mr. Bradley Simon, the testifying representative for RBCM, testified that "binding" meant that Defendants could have some legal recourse if the qualified purchaser pulled back from the negotiations. *Tr. 225-26*. This was critical to RBCM because they needed to sell the Division within 60 days of the receipt of the Letter of Intent and therefore only serious offers could be considered. *Tr. 215-16*. Because time was of the essence to close the deal by May 31, 2003, the Letter of Intent needed to be "binding" in order for the parties to negotiate the final terms of the sale within that short time period. *Tr. 215-16, 252-53*.

"Binding" according to Mr. Simon had meaning to both parties as being a Letter of Intent that had the effect of providing a legal recourse to RBCM if the proposed purchaser pulled back and refused to negotiate. *Tr. 224-25*. RBCM could then seek damages for the lost opportunity of negotiating with another party and for expenses paid to negotiate the deal. *Tr. 257-58*. Having this material factor in the contract ensured RBCM that only serious purchasers who had done their homework and were ready to consummate a deal would be brought to the table. *Tr. 215-16, 280-81*. Having both Plaintiffs bring a qualified potential purchaser to the table by March 31, 2003 with a binding letter of intent meant that the Plaintiffs had used their knowledge and expertise with the

Division to work with the potential purchaser prior to the presentment of the Letter of Intent and left the final details of the sale to the purchaser and RBCM.

ANALYSIS

To succeed on their claim for breach of contract, Plaintiffs Harrison and Stratos must prove each of the following elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting injury to the plaintiff. *Applied Industrial Material v. Malinckrodt, Inc.*, 10 F. Supp. 2d 934, 937 (N.D. Ill. 2000). In construing the terms of the Agreement, the Court's analysis begins "with the language of the contract itself." *Much v. Pacific Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001) *quoting Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F3d 1059, 1060-61 (7th Cir. 1996). If the language unambiguously answers the question, the inquiry is over, and extrinsic evidence outside the "four corners" of the document may not be considered. *Davis v. G.N. Mort. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005); *Much*, 266 F.3d at 643; *RIV VIL, Inc. v. Tucker*, 979 F. Supp. 645, 650-51 (N.D. Ill. 1997) (Bucklo, J.). Where the parties define terms to a contract, the Court is obligated to enforce the contract as written. *Heartland Rail Corp. v. Railroad Development Corp.*, No 02 C 2850, 2003 WL 21145635, at *8 (N.D. Ill. May 15, 2003)(Coar, J.).

In this case, the parties disagree regarding two terms in the contract: "binding" and "claimants." Plaintiffs claim that "claimants" does not necessarily mean both Plaintiff Harrison and Stratos even though the term is defined as "Harrison and Statos" because the contract states also that the terms could be interpreted in context. The plural use of the term "claimants" is critical to an understanding of whether both Plaintiffs were required pursuant to the terms of the Settlement Agreement to present a Letter of Intent jointly, or if the presentation of a Letter of Intent by one

10

Plaintiff sufficed to fulfill the obligation of presentment by both Plaintiffs. As to the term "binding," Plaintiffs claim that no Letter of Intent can ever be binding since it is merely an offer to negotiate and therefore the word is superfluous here and can not be cause for a breach. Defendants counter that the term "binding" was material to the contract because it provided them with the assurance that only serious purchasers who could consummate a deal within a short period of time were brought to the table. Without the "binding" nature of the Letter of Intent, Defendants claim there would be no value whatsoever to the Letter of Intent and would make the payment to Defendants a nullity since they would have done nothing to receive that money except present a worthless piece of paper.

Because these two terms are ambiguous, the Court looks to the extrinsic evidence presented at trial to determine the intent of the parties. See *Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 547 (7th Cir. 2004) *quoting Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill.App.3d 890, 773 N.E.2d 1277, 1283 (2002) ("Extrinsic evidence is admissible to explain the meaning of words in a contract when there is an ambiguity or the words are susceptible of different interpretations.") The Court concludes that all of the actions of both parties indicate that both Plaintiffs and Defendants understood that the Settlement Agreement required that the Letter of Intent be presented by both Plaintiffs and that the Letter of Intent be binding. The evidence further supports that both parties understood those two terms to be material, acted in accordance with that understanding, and demonstrated that understanding through their actions.

<u>Joint Presentment</u>

At trial, Mr. Simon testified that the Letter of Intent was to be presented by both parties to avoid any conflict between the Plaintiffs and to avoid any future litigation. *Tr. 223-24*. This statement is supported by the plain language of the Settlement Agreement as it defines "claimants"

11

as "Harrison and Stratos." *Ex. 1*. Counsel for Plaintiffs argued that the Plaintiffs were jointly and severally liable under the Settlement Agreement and therefore the presentment of the Letter of Intent by Stratos fulfilled the obligation of both parties.[3] This argument sounds convincing in retrospect, but it in no way reflects the parties understanding at the time of the agreement.

Instead, Harrison and Stratos understood that they were to present a joint Letter of Intent and were clearly working toward that goal. But Plaintiffs did not reach that goal, as is clear from the emails sent from Harrison to Defendants regarding Harrison's inability to reach an agreement prior to the expiration time under the Settlement Agreement. *See Ex. 22 and 23*. Stratos' letter to Defendants further states the same:

> As you know, the Settlement Agreement contemplates a joint letter of intent between (a) both Mr. Stratos and Mr. Harrison and (b) the third party investor. At this point, Messrs. Stratos and Harrison have yet to agree to terms pursuant to which they can proceed together, so this letter of intent is being presented solely on behalf of Mr. Stratos.

*Ex. 17*. The Stratos cover letter also leaves open the possibility that Harrison would join him in the presentment of the Letter which Stratos was leaving open "until midnight tonight." *Id.* Recognizing that the letter was not presented by both Plaintiffs, Stratos further asks that RBCM "treat the enclosed letter of intent *as nonetheless* satisfying Section 4 of the Settlement Agreement. *Id.* (Emphasis added).

Both Stratos and Harrison knew that they had failed to fulfill the term of the Settlement Agreement requiring them to present the letter jointly, as reflected in their own statements in the

---

[3] Although Plaintiffs' counsel cited to the part of the Settlement Agreement which referred to Claimants' tax liability as a place where the term referred only to one individual's tax liability and could not mean that Harrison, for example, was liable for the taxes of Stratos; the Settlement Agreement accounted for that discrepancy by stating "unless the context otherwise requires."

cover letter and emails. It is only in hindsight that they now come before the Court with the theory that the single presentation of the Letter of Intent by Stratos sufficed to fulfill their legal obligation under the Settlement Agreement. If in fact they believed that Stratos' single presentation of the offer was sufficient, why did they wait until three years after the presentation to tell anyone that theory of their case? In truth, they did not respond to RBCM's rejection of the Letter of Intent even when RBCM told them that the letter needed to be "joint," a term that they failed to take issue with at the time. In considering extrinsic evidence, the Court focuses on both the negotiations of the parties, and their course of performance at the time. *Elda Arnold and Byzantio, L.L.C. v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 701-02 (7th Cir. 2002).

Mr. Simon further testified that it was critical to RBCM that the letter be presented jointly because of the history of litigation between the parties. *Tr. 223-24*. The disputes between Harrison and Stratos are reflected in their inability to agree on the purchaser who would be brought to the table, most likely due to their individual negotiations for future employment with those potential purchasers.[4] The fact that this dispute existed gives credibility to Mr. Simon, who testified that the joint presentment of the letter was a material factor in the agreement because RBCM wanted to avoid any further litigation stemming from their internal disputes. *Tr. 224*.

Therefore the Court finds that both Plaintiffs were required to present the binding Letter of Intent to Defendants, that Plaintiffs knew that to be a requirement and that their actions at the time of the contract reflect their knowledge of that requirement, and they therefore breached that

---

[4]Plaintiff Harrison was hired by Pinnacle, the third party purchaser that he was attempting to bring to the table by the March 31, 2006 deadline and that was the ultimate purchaser of the Division.

13

requirement of the Settlement Agreement when they failed to present a Letter of Intent from both Plaintiffs.

## "Binding" Letter of Intent

The parties next dispute what was meant by a "binding" letter of intent as the term is not defined in the Settlement Agreement. Plaintiffs allege now that it really means nothing, that no letter of intent can be binding, and therefore the letter that was presented by Plaintiff Stratos fulfilled Plaintiffs' obligations under the contract. Defendants claim that the term "binding" was critical to their negotiations because the deal needed to take place within 60 days of the receipt of the letter of intent, that making the letter binding would mean that only serious purchasers would be brought to the table to negotiate, and that a failure to negotiate in good faith under that term would mean that they would have legal recourse to recover, at a bare minimum, their costs of negotiation, and at a maximum their lost opportunity costs. The Court finds that both parties understood "binding" to mean that the purchaser brought to the table had already worked with Plaintiffs to understand the details of the impending deal, would be bound to negotiate in good faith to hammer out the final details of the deal, and would be ready to complete the deal by May 31, 2003.

Once again, Plaintiffs argue now that the letter presented on March 31, 2003 fulfilled the obligations of the Settlement Agreement. Yet their own words say otherwise and their actions show that they knew that they had failed to fulfill this material requirement of the Settlement Agreement. The Letter of Intent sent by Resource Bank was clear: "This Letter of Intent does not represent or create any legally binding obligation of you or Buyer." *Def. Ex. 17*. Mr. Simon testified that they needed much more than this expression of intent. *Tr. 257-58*. Defendants were not requiring a completed contract with Resource Bank but were expecting a serious Letter from a bona fide

14

purchaser who had done its homework and was ready to negotiate the final details of a purchase. Letters of Intent have varying degrees of specificity and looking to the intent of the parties can reveal what specificity is required. *See, e.g.*, *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983 (7th Cir. 2003) (finding a letter of intent not binding due to missing material terms and language indicating intent not to be bound); *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385 (7th Cir. 1999) ("to be binding, [informal letters of intent] must clearly manifest the desire of each party to be bound to the material terms of the proposed deal"); *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423 (7th Cir. 1989) (letter of intent that stated "subject to" a definitive agreement indicated parties' intent not to be bound); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1221 (7th Cir. 1988) (finding that a letter of intent would not bind the parties if it said that the parties "understood that this is not a binding agreement. . .").

Here, one thing is certain, if the parties wanted a letter of intent that was merely a business statement that stated, in essence, we are interested in your company, they would not have linked the signficant monetary value of the Holdback Amount to that letter. Instead, the parties knew that Harrison and Stratos were in the best position to discuss the Division with potential buyers, to show them the numbers, the lines of business, the operations, and the workings of the Division which they ran prior to May 31, 2003. It made complete sense to have Plaintiffs conduct the due diligence, the pre-negotiations, and the initial review of offers from potential purchasers because they were in the best position to know their own business. That due diligence, research, and pre-negotiation had value to RBCM and they equated that value in the hundreds of thousands of dollars and dangled that amount as a carrot to Plaintiffs to do the work necessary to present only those third party purchasers who would be prepared to complete a deal within 60 days. To suggest that a letter which states in

15

short that a party is interested in the company but is not bound to negotiate any further is a worthless document to RBCM. On the other hand, a document from a third party that has been vetted, has done its research and knows the business that it seeks to purchase and simply wants to hammer out the details over a few weeks has value to RBCM – hundreds of thousands of dollars of value. That value and the corresponding Holdback Amount contemplated by the parties in the Settlement Agreement is the most significant piece of extrinsic evidence that supports a finding that the parties understood that they must have a "binding" letter of intent in hand on March 31, 2003.

Of course, the conduct of the Plaintiffs again supports a similar finding. The letter sent by Stratos seeks to have RBCM "treat" the Letter of Intent as if it were in compliance with the Settlement Agreement, reflecting Stratos understanding that the letter did not comply with the terms of the Agreement. Again, when Defendants informed Plaintiffs that they were not in compliance with the terms, Plaintiffs never sent a letter exclaiming that the Letter of Intent was sufficient, never attempted to show that the Resource Bank letter was something more than merely a general expression of interest, and never objected to Defendants statement that the letter was insufficient.

Finally, and most telling, Plaintiffs accepted the rejection of the Letter of Intent as not fulfilling their obligations under the contract by signing and accepting the monthly statements reflecting that they were not entitled to the Holdback amount. Rather than fight Defendants in April claiming that they had fulfilled their obligations, even claiming that they should be compensated in some way for their efforts, they merely signed off on the zero amount of the Holdback and did not seek to receive any payments.[5]

---

[5]During closing arguments at trial, the Court asked Plaintiffs if they had presented an unjust enrichment claim in their complaint which was filed over two years ago. Plaintiffs' counsel stated that they did not. Subsequent to the trial, Plaintiffs sought to amend their complaint to add such a

Conclusion

The Court finds that the parties' actions as evidenced in the documents, communications, and their conduct shows that they expected Plaintiffs to present together a binding letter of intent and they failed to do so by March 31, 2003. As a result, Plaintiffs breached the Settlement Agreement and are not entitled to the Holdback amount.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Dated: May 11, 2006

---

claim. Aside from the extremely delayed request which this Court in its discretion could deny solely due to its tardy presentment, no evidence was presented by Plaintiffs to demonstrate that it was Plaintiffs' actions which brought about the ultimate contract with Pinnacle Financial Group, but rather, the only evidence presented at trial was that Plaintiff Harrison had been working to bring Pinnacle to the table. The ultimate deal was consummated between Pinnacle and RBCM. The Court denied Plaintiffs' request to add the unjust enrichment claim; but even if the Court were to have allowed the claim, there are no facts to support such equitable relief.